Andrew W. Stavros (8615)
**STAVROS LAW P.C.**
8915 South 700 East, Suite 202
Sandy, Utah 84070
Tel: (801) 758-7604
Fax: (801) 893-3573
Email: andy@stavroslaw.com

*Attorney for Plaintiff Ashley Bailey*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ASHLEY BAILEY, an individual,<br><br>       Plaintiff,<br><br>vs.<br><br>PCDS, LLC, a Utah limited liability company, d.b.a., PARK CITY DENTAL SPA,<br><br>       Defendant. | **COMPLAINT**<br><br>**(JURY DEMAND)**<br><br>Case No.: 2:20-cv-00079-**TS**<br><br>Judge: **T**ed Stewart<br><br>Magistrate Judge: |

Plaintiff Ashley Bailey by and through her counsel, brings this complaint against PCDS,

LLC, a Utah limited liability company, d.b.a. Park City Dental Spa, and for causes of action,

alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.       Plaintiff Ashley Bailey ("Plaintiff" or "Bailey") is an individual who, at all times

relevant to this complaint, resided in Summit County, State of Utah.

2.       PCDS, LLC, is a Utah limited liability company doing business as Park City

Dental Spa in Summit County, State of Utah (hereinafter referred to as "Defendant" or "PCDS").

1

3.      At all times relevant to this complaint, PCDS was an employer within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(b).

4.      At all times relevant to this complaint, Bailey was an employee of PCDS within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e(f).

5.      Jurisdiction is proper before this court pursuant to 28 U.S.C. § 1343(4). Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

6.      Bailey has exhausted her administrative remedies, filed a charge of discrimination with the Utah Labor Commission and Equal Employment Opportunity Commission, and received a notice of right to sue from the EEOC, date November 14, 2019, a copy of which is attached hereto as **Exhibit B**.

### FACTUAL BACKGROUND

7.      Bailey was hired by PCDS as a Dental Associate on or about March 1, 2014.

8.      Bailey entered into an employment agreement with PCDS in March 1, 2014, a copy of which is attached hereto as **Exhibit A** (the "Employment Agreement").

9.      Pursuant to the terms and conditions of the Employment Agreement, Bailey worked as a Dental Associate and for such work she was to be paid "Thirty Percent (30%) of all collections, including lab fees, received by [PCDS] for services rendered by Employee." (See Ex. A, p. 1, ¶ 3(a)).

10.     In addition, except for death or disability, pursuant to the Employment Agreement, Bailey could only be terminated by PCDS with thirty (30) days prior written notice, or "for cause." (See Ex. A, p. 3).

11.     Under paragraph 6(c) of the Employment Agreement, "for cause" termination is specifically defined and described and, if termination is "for cause," Bailey forfeits "all [her]

2

rights to receive any compensation, benefits, or options to purchase under this Agreement." (See Ex. A, p. 3, ¶ 6(c)).

12.    For termination with prior notice, the Employment Agreement provides that "either party shall have the right to terminate this Agreement for any reason by giving the other party notice of its intent to terminate" and that a notice of termination "shall be effective thirty (30) days after notice is given."

13.    Further, the Employment Agreement provides that "after termination of this Agreement, if any patient requests [Bailey's] whereabouts, [PCDS] will furnish such patient with Bailey's office phone number and address, provided [Bailey] is not in violation of this Agreement." (See Ex. A, p. 2, ¶ 3(d)).

14.    On January 16, 2019, PCDS provided notice to Bailey of its decision to terminate her without cause pursuant to paragraph 6(d) of the Employment Agreement. Specifically, Bailey was told by Dr. Abraham that he was terminating her from her position "without cause" because PCDS "wanted to go in a different direction" and that "the atmosphere was not as cozy as it once was." Dr. Abraham then offered Bailey the option to stop working as of January 16, 2019 or to continue working thirty (30) days after being terminated, as permitted by the Employment Agreement. Bailey was then given a separation agreement for review, which required to waive and release any claims she had against PCDS.

15.    When Bailey did not sign the separation agreement, Bailey was terminated by PCDS on February 4, 2019. PCDS alleged her termination was "for cause" pursuant to paragraph 6(c) of the Employment Agreement. However, there was no basis for terminating Bailey "for cause" under the Agreement, and PCDS's proffered reasons for her termination were

3

pretextual. Similarly, there was no legal reason for PCDS to exercise its right to terminate Bailey without cause on January 16, 2019, as explained more fully herein.

16.     After her termination, "PCDS failed to provide Bailey's patients with office phone number and address, upon request," as required by the Employment Agreement.

17.     Bailey was also not paid all compensation due and owing following her termination, including for collections PCDS received following her termination, and PCDS also failed to pay her all amounts due and owing to her pursuant to paragraph 3(a) of the Employment Agreement during her employment, including lab fees and all of the collections she generated.

18.     During Bailey's employment, she was also subject to discrimination and retaliation, in violation of the law, by PCDS's owner and spouse.

19.     Shortly after being hired, Bailey informed her employer that she was a member of the Church of Jesus Christ of Latter-Day Saints ("LDS" or "Mormon").

20.     After notifying her employer of her faith, Bailey was subjected to discrimination because of her beliefs, including ridicule, insults and derogatory comments about her faith. When Bailey would ask such conduct to stop and complained about such conduct, she was ignored.

21.     James Abraham, the owner of PCDS, and Dawnetta Abraham, his spouse and office manager, regularly made derogatory and discriminatory comments to Bailey regarding her religion.

22.     For example, on one occasion Ms. Abraham stated that she believed Bailey would not "last long" because "the last hygienist that was Mormon could not hack it" and "the hygienist quit because she could not handle conversations about one-night stands" and "swearing" in the office. These types of comments were common and not isolated.

4

23.     Additionally, Ms. Abraham openly and regularly expressed her strong dislike of members of the LDS Church, and members' beliefs.

24.     In addition to Ms. Abraham's comments, Dr. Abraham also made negative and derogatory comments about Mormons on an ongoing basis.

25.     Some examples of Dr. Abraham's comments included: "I just hate Mormons;" "the people who have cheated me the most are Mormons;" "the people who have screwed me are Mormon;" and "women [in Park City] get together to have pill parties and do you know who the ones running them are? The Mormon women." Bailey was highly offended by Dr. Abraham's comments.

26.     Bailey complained about the comments made by Dr. Abraham and Ms. Abraham and notified them that their derogatory comments made her uncomfortable and that she believed the comments were inappropriate.

27.     Regardless of her complaints, Dr. Abraham and Ms. Abraham disregarded Bailey's complaints and instead their derogatory comments continued.

28.     On another occasion, Dr. Abraham told Bailey a story regarding a patient who was known as a local leader for the LDS Church. The patient came into the office for various dental procedures and prior to each procedure he would comment, "give me the gas Doc." Dr. Abraham then alleged that the patient only got nitrous so he could get the "high feeling".

29.     Shortly thereafter, Dr. Abraham informed Bailey that he watched videos online about the LDS temple ordinances. Bailey notified Dr. Abraham that she did not feel comfortable discussing the videos at work and that the temple ceremony and ordinances were sacred to her, and were not intended to be shared.

30.     Dr. Abraham ignored Bailey's comment and instead continued by stating, "How am I supposed to find out more about the religion if I didn't watch it." Bailey informed Dr. Abraham that some members of the LDS faith are unable to participate in the ceremonies and/or enter into the temple, that the ordinances are sacred and it is not normal practice for members of her faith to talk about the ordinances in casual conversation.

31.     Bailey once again attempted to express her discomfort with Dr. Abraham's insensitive and discriminatory comments and made complaints regarding Dr. Abraham's discriminatory comments about members of the LDS Faith, all of which were ignored. Instead, Dr. Abraham disregarded these complaints and instead continued to disparage and belittle Bailey for being a member of the LDS Church.

32.     Dr. Abraham repeatedly told Bailey "we need to get you drinking" and "you would feel so much better if you were drinking" alcohol, even though he knew and understood that as an active member of the LDS Church Bailey did not drink alcohol.

33.     During her employment, Bailey was also subjected to discrimination and differential treatment because of her gender.

34.     After being hired, and after she had complained, Bailey was not added to PCDS's hold message for patients to hear while on hold. Bailey asked Ms. Abraham to add her name to the hold message on several occasions, but her requests were ignored.

35.     In or about 2014, PCDS won a "Best of Park City" award for "Best Dentist." A banquet was held in order to honor those who had received a "Best of Park City" award. Regardless of the fact that Bailey was a dentist at PCDS, she was not invited to attend the banquet. Dr. Abraham attended the banquet and received the award on behalf of PCDS.

6

36.     After Bailey worked in the office for over a year, in 2015 PCDS was once again nominated for "Best of Park City" award for "Best Dentist." Shortly after being notified of the nomination, Bailey went into work and noticed an assistant in the office was dressed for a semi-formal occasion. Bailey commented on her attire and inquired about why she was dressed up. The assistant responded saying she had been invited to attend the "Best of Park City" banquet with Dr. Abraham and Ms. Abraham. Bailey asked Dr. Abraham why she was not invited to the banquet, and he said, "to talk to Dawnetta." Ms. Abraham stated there were "no more tickets".

37.     In 2016, Dr. Bailey was invited to go to the "Best of Park City" banquet where PCDS again won for "Best Dentist." However, at that ceremony the wording of the "Best Dentist Award" winner was changed from PCDS to "Jim Abraham, DDS" both at the award ceremony and on the actual award itself. The result was to exclude Bailey from being recognized as a dentist who had worked in the practice for over 2 years.

38.     In or about 2016, PCDS hired a new Dental Associate, David Sandberg. Shortly after being hired, Dr. Sandberg was given business cards that had his name spelled correctly (unlike Bailey). Additionally, Dr. Sandberg was immediately added to PCDS's hold message for patients, and he was treated more favorably than Bailey with respect to his terms, conditions and privileges of employment.

39.     In 2017, PCDS had once again been nominated for a "Best of Park City" award for "Best Dentist." Even though he worked for PCDS for less than a year, Dr. Sandberg, along with his wife and children, were invited to attend the banquet.

40.     Bailey complained about being subjected to discrimination and differential treatment and informed both Dr. Abraham and Ms. Abraham that she believed the treatment was

7

because she was female, all of which were ignored.  Instead, the differential and discriminatory treatment of Bailey escalated.

41.     After Dr. Sandberg was hired, Dr. Abraham and Ms. Abraham informed the front desk to "fill Dr. Sandberg's schedule with patients" and that his schedule was a "priority."  These instructions included to schedule "Bailey's patient's treatment with Dr. Sandberg" if there was any availability in his schedule. Thereafter, Bailey's appointments with patients were significantly reduced.

42.     Dr. Bailey approached Dr. Abraham monthly and many times weekly regarding Dr. Sandberg being scheduled treatment that she had diagnosed and/or her poorly filled schedule. Dr. Abraham deflected her complaints and advised her to talk to the front desk or other office manager regarding these issues. The front desk would not resolve these issues or would refer Bailey back to Dr. Abraham who brushed Bailey's complaints aside.

43.     Bailey, recognizing the increasing scheduling disparity and her ongoing disparate treatment, began to keep a record of the new patients Dr. Sandberg had received versus the new patients she received.  At the end of one month, Bailey realized that Dr. Sandberg had been given approximately 64 new patients and she was given 7 new patients.  Bailey immediately notified Dr. Abraham of the results and the apparent discriminatory treatment, to which nothing was done.

44.     In addition, Bailey was only assigned to one (1) room to see patients and Dr. Abraham and Dr. Sandberg were each given two (2) rooms to see patients. Bailey complained about the scheduling discrepancies and room disparity, but her complaints were again ignored.

45.     Bailey was an effective dentist and PCDS had no reason to terminate her, or discriminate against her in the matter set forth above. She neither engaged in misconduct nor performed her duties as a dentist unacceptably.

46.     In or about January 2019, Bailey's colleague discovered a cell phone that had been placed in the private doctors' office/lounge that was set to record conversations. Bailey was later made aware that Dr. Abraham had left the phone to record Bailey in order to find a reason to terminate Bailey "with cause" from her employment under the Employment Agreement.

47.     Furthermore, in retaliation for her complaints, Bailey was informed by that the front desk had been given "marching orders" to not fill Bailey's schedule and make sure to only fill Dr. Abraham's and Dr. Sandberg's schedules in an effort to cause Bailey to quit.

48.     Bailey immediately complained to Ms. Abraham about the retaliation and stated that per her contract, PCDS had an obligation to fill her schedule.  In response to Bailey's complaint, Ms. Abraham asked the front desk employees to sign a document stating that they were trying to fill Bailey's schedule and that Dr. Abraham and Ms. Abraham were not interfering with her schedule.

49.     During this time period, a patient came into PCDS requesting treatment.  Dr. Abraham briefly examined that patient and ultimately decided not to treat the patient himself. During this time, Bailey had availability in her schedule to see the patient. However, instead of allowing Bailey to see the patient, Dr. Abraham instructed the front desk to schedule the patient with Dr. Sandberg, which gave him three (3) patients to treat at the same time.

50.     On a separate occasion, on a snowy day Ms. Abraham made the decision to cancel all of the dental patients for the day after realizing that Bailey was the only dentist scheduled to

9

work.  After the decision was made, Bailey asked Ms. Abraham if she planned on closing the office, to which Ms. Abraham stated that hygienists would continue to see patients.

51.     After her termination, Bailey obtained a new position.  While working for her new employer, Bailey was informed by several patients that Dr. Abraham and PCDS had not informed Bailey's previous patients that she was no longer working for PCDS and also refused to notify Bailey's existing patients of where she was working when they inquired.

52.     Additionally, Bailey was also notified by a patient that she had recently sought Botox treatment from Dr. Abraham.  During the appointment, Dr. Abraham informed the patient that "[Bailey] mixes the Botox a different way than him" and that "the results would be different if the patient visited Dr. Bailey for the treatment."

### FIRST CAUSE OF ACTION
#### (Discrimination in Violation of Title VII of the Civil Rights Act)

53.     The preceding paragraphs are incorporated herein by reference.

54.     PCDS is an employer within the meaning of 42 U.S.C. § 2000(e)(b). At all time relevant hereto, PCDS employed more than fifteen (15 employees.

55.     Pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1), it is unlawful for an employer to discrimination against an individual with respect to terms, conditions or privileges of employment because of the individual's gender and religion.

56.     Bailey is a female and a member of the LDS faith.

57.     PCDS subjected Bailey to an adverse employment actions from PCDS by, among other things, subjecting her to differential treatment in the terms of her job duties and responsibilities, reducing her schedule, job assignment, compensation and ultimately terminated her from her employment as set forth above.

58.     Bailey's gender and/or religion were motivating factors for PCDS's actions.

59.     As a direct result of PCDS's discriminatory conduct, Bailey has suffered damages including the loss of pay and benefits and other employment related compensation she lost because of PCDS's unlawful termination and its disparate treatment of her during her employment with PCDS.

60.     Bailey is also entitled to recover compensatory damages in an amount to be proven at trial, including non-pecuniary losses for emotional distress, pain and suffering, humiliation and related damages, in an amount to be determined by the tier of fact, plus attorney's fees and costs incurred in bringing this action.

61.     PCDS's conduct during her employment was willful and malicious and manifested a knowing and reckless indifference toward, and disregard of, Bailey's interests and federally protected rights.

62.     As a result of PCDS's willful and malicious conduct, or knowing and reckless indifference, in discriminating against and Bailey based upon her gender and religion, Bailey is entitled to an award of punitive damages in an amount to be proven at trial.

63.     Bailey is also entitled to recover such other relief as is available under the law.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII of the Civil Rights Act)

64.     The preceding paragraphs are incorporated herein by reference.

65.     Title VII of the Civil Rights Act prohibits discrimination on the basis of gender and religion in the enjoyment of all benefits, privileges, terms and conditions of employment, as well as retaliation for reporting complaints of discrimination.

11

66.     Bailey engaged in protected activity by opposing the treatment she received the she reasonably believed constituted unlawful discrimination as alleged above, as well as complaining to management-level employees of PCDS.

67.     The actions of PCDS in altering Bailey's job duties, assignment, compensation and functions and ultimately terminating her from her employment for opposing discrimination on the basis of her religion and gender constitutes retaliation prohibited by Title VII of the Civil Rights Act.

68.     PCDS's actions have directly and proximately caused Bailey substantial and future economic loss, including lost wages, damages to her career and professional reputation, and extreme humiliation and pain and suffering, in an amount to be determined at trial.

69.     PCDS's actions were taken with malice and were wanton, reckless and in knowing disregard of Bailey's legal rights and, as such, renders PCDS liable for punitive damages.

70.     Bailey is also entitled to an award of attorney fees and costs, and such further an additional relief as allowed by law.

### THIRD CAUSE OF ACTION
### (Breach of Contract)

71.     The preceding paragraphs are incorporated herein by reference.

72.     Bailey entered in a valid and enforceable employment contract – the Employment Agreement.

73.     Bailey performed all of her duties and obligations under the Employment Agreement, or was relieved from doing so.

12

74.    PCDS breached the contract by, among other things, failing to pay Bailey all amounts due and owing, including compensation due to her under the terms of the Agreement, failing to pay her compensation during her no cause termination period, failing to credit her compensation with lab fees and related items, as required by the Agreement, writing off accounts that PCDS received payment for, and failing to refer patients to Bailey following her termination as required by the Employment Agreement.

75.    PCDS also breached the Employment Agreement by failing to schedule patients for Bailey to see, directing patients to see other providers, shifting patients for more expensive procedures to other providers and deducting fees from Bailey's compensation that were not chargeable to her, as well as failed to pay her for hygienist work performed on her chair.

76.    As a direct and proximate cause PCDS's breach, Bailey suffered damages in an amount to be proved at trial. Bailey seeks recovery of all general, special and consequential damages caused by PCDS's breach.

77.    Bailey also seeks recovery of attorneys' fees and costs should she succeed on any of her claims and other relief as is available under law, and as allowed by the Employment Agreement.

## FOURTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

78.    The preceding paragraphs are incorporated herein by reference.

79.    Bailey entered into a valid and binding contract with PCDS governing the terms and conditions of her employment – the Employment Agreement.

80.    An implied covenant of good faith and fair dealing inheres in every contract, including the Employment Agreement.

13

81.     Under the covenant of good faith and fair dealing, each party promises not to intentionally do anything to injure each other's right to receive the benefits of the contract.

82.     Accordingly, PCDS was obligated to deal with Bailey fairly and in good faith and not intentionally or purposely do anything to destroy or injure Bailey's right to receive the fruits of the Employment Agreement, and to realize the parties' justified expectations relating thereto.

83.     As noted more fully above, PCDS breached its duty of good faith and fair dealing by, among other things, intentionally and purposefully failing to perform as required under the Employment Agreement, failing to act on promises and representations made to Bailey, failing to pay her as agreed and to perform its obligations to her in good faith, and thereby acted in a manner inconsistent with the common purpose of the contract and the justified expectations of Bailey.

84.     As a direct result of PCDS's breach of its duty to act in good faith and deal fairly, Bailey has been damaged in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Bailey prays for judgment against PCDS as follows:

1.     For judgment in Bailey's favor and against PC on each cause of action set forth above;

2.     For an order awarding Bailey all lost wages, compensation and other economic benefits lost as a result of PCDS's actions and omissions, including back pay and front pay (in lieu of reinstatement), and other pecuniary and non-pecuniary damages, as allowed under law;

3.     For an order awarding Plaintiff compensatory damages including damages for emotional distress, pain and suffering, humiliation and loss of reputation and career, in an amount to be determined at trial;

14

4.      For an order awarding pre- and post-judgment interest as applicable;

5.      For and order awarding Bailey attorney fees and costs of suit, including expert witness fees, incurred in bringing this action, as applicable under Bailey's claims;

6.      For an order awarding general, special and consequential damages, as applicable;

7.      For an order awarding punitive damages, as applicable; and

8.      For an order awarding such further and additional legal or equitable relief as the Court deems appropriate.

DATED this 7th day of February, 2020.

/s/     **Andrew W. Stavros**
Andrew W. Stavros
STAVROS LAW P.C.
*Attorney for Plaintiff Ashley Bailey*

# EXHIBIT A

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement"), dated this **01** day of March 2014 is by and between PCDS, PLLC, a Utah professional limited liability company (the "Company") and ASHLEY BAILEY, an individual ("Employee").

## RECITALS

A. The Company desires to provide for and is in need of the services of that are typically provided by the Employee; and

B. Employee desires to be in the employment of the Company, upon the terms and conditions set forth herein.

In consideration of the foregoing, the parties agree as follows:

## AGREEMENT

1. **Employment.** The Company hereby employs Employee to render services to the Company in the position and with the duties and responsibilities described in Section 2 hereof. Employee's employment with the Company pursuant to this Agreement shall commence as of the date first written above.

2. **Position, Duties, and Responsibilities.** Employee hereby accepts employment with the Company as a Dental Associate. Employee's specific duties will include all duties that the Company sees fit in order to properly perform Employee's position, with a schedule agreed upon by Company and Employee.

3. **Compensation, Benefits, Expenses.** During the term of the employment, Employee shall be entitled to the following:

(a) **Wage.** Employee will be paid an amount equal to Thirty Percent (30%) of all collections, including lab fees, received by the Company for services rendered by Employee. Employee will be paid wages once per month, said wages being calculated from the previous calendar month.

(b) **Benefits.** Employee will receive no benefits at this time.

(c) **Costs incurred by Employee.** Any special or non-standard instruments or supplies that Employee requests will be ordered in Employee's own name and paid for by Employee unless such items are approved by the Company prior to ordering, and in such case, the cost for the same shall be paid by the Company. Unless otherwise agreed to by the Company, Employee shall also bear the cost for the following: (i) lab charges attributable to Employee's work on family members; (ii) all health insurance, disability coverage and life

insurance premiums for Employee and Employee's family; (iii) all personal long distance telephone charges made at the office; (iv) cell phone costs; and (v) transportation costs.

(d)   Access to Records.  At any time during the term of this agreement and following the termination or expiration hereof, the Employee shall be afforded such reasonable access to the records as may be needed in order to respond to or defend any professional liability claim that may be asserted.  After termination of this Agreement, if a patient requests Employee's whereabouts, the Company will furnish such patient with Employee's office phone number and address, provided Employee is not in violation of this Agreement.  If any patient chooses to seek treatment with Employee, the Company will make copies of the patients' records available to Employee, but only after a formal request from such patient.



(e)   Future Buy-In Option.  If the Company, at any future time, should decide to accept a partner buy-in, Employee shall have the first right of refusal, provided that Employee is still employed with the Company.

(f)   Malpractice Insurance.  It is the responsibility of the Employee to carry and maintain malpractice insurance.

4.   Term of Agreement.  Unless earlier terminated as provided herein, the term of this Agreement is for twelve (12) months and shall commence on the date this Agreement is executed.  Unless terminated as provided herein, at the end of the initial twelve (12) month term, this Agreement shall automatically renew from year to year as provided in Section 5 below.

5.   Renewal.  The term of this Agreement shall automatically be renewed for successive periods of one (1) year each, upon the same terms and subject to the same conditions as provided herein, or upon new or different conditions as may be mutually agreed upon by the parties, unless either party gives the other party notice that the term shall not be so extended at least thirty (30) days prior to the expiration of the then-current term of this Agreement.

6.   Termination of Employment.

(a)   By Death.  Employee's employment with the Company shall terminate automatically upon the death of Employee.  The Company shall pay to Employee's beneficiaries or estate, as appropriate, the Employee's salary and any other accrued benefits to which he is entitled at the time of death.  Thereafter, the Company's obligations hereunder shall terminate.  Nothing in this Subsection (a) shall affect any entitlement of Employee's heirs to the benefits of any applicable group life insurance plan.

(b)   By Disability.  If, during the term of this Agreement, Employee should become disabled (as hereinafter defined), the Company shall have the right, to the extent permitted by law, in its sole discretion, to terminate this Agreement and Employee's employment with the Company, in which case Employee's salary shall be paid up through the last day of the notice period given by the Company.  Nothing in this Subsection (b) shall

2

affect Employee's rights under any disability plan in which he is a participant. For purposes hereof, Employee shall be considered "Disabled" if:

      (i)    Employee is entitled to benefits under any long-term disability income plan applicable to Employee; or

      (ii)    Employee's physical and/or mental condition is such that Employee is unable to perform those duties Employee would otherwise be expected to continue to perform as an employee of the Company, and Employee's non-performance of such duties can reasonably be expected to continue or does continue for not less than two (2) months. The determination that Employee is disabled shall be made in good faith by Company, whose determination shall be final and binding on Employee.

      (c)    <u>Termination for Cause</u>. During the Term, Employee's employment with the Company may be terminated "for cause," which shall include (i) Employee's conviction for, or plea of nolo contendere to, any felony or a misdemeanor involving moral turpitude; (ii) Employee's commission of an act involving personal dishonesty or fraud involving personal profit in connection with Employee's employment with the Company; (iii) Employee's commission of an act involving willful misconduct or gross negligence on the part of Employee in the conduct of his or her duties hereunder; (iv) Employee's breach of any material provision of this Agreement where such breach continues for a period of twenty (20) days after Employee's receipt of written notice of such breach from the Company; (v) willful violation of the Company's policies and practices; or (vi) Employee's failure to fulfill its obligations under this Agreement. In the event of termination under this Section 6, the Company's obligations under this Agreement shall cease and Employee shall forfeit all his rights to receive any compensation, benefits, or options to purchase under this Agreement, except that Employee shall be entitled to Employee's compensation for services already performed as of the date of termination of Employee's employment hereunder.

      (d)    <u>Termination for No Cause</u>. Either party shall have the right to terminate this Agreement for any reason by giving the other party notice of its intent to terminate. Unless otherwise agreed upon by the Employee and the Company, a termination under this Section 6(d) shall be effective thirty (30) days after notice is given.

7.    <u>Termination Obligations</u>.

      (a)    Employee hereby acknowledges and agrees that all personal property, including, without limitation, all equipment, books, recipes, manuals, records, reports, notes, contracts, lists, and other documents or materials, or copies thereof, furnished to or prepared by Employee in the course of or incident to his employment belong to the Company and shall be promptly returned to the Company upon termination of Employee's employment with the Company. Following termination, Employee will not retain any written or other tangible material containing any proprietary information.

3

(b)      Upon termination of Employee's employment with the Company, Employee shall be deemed to have resigned from all offices then held with the Company or any parent or subsidiary of the Company.

(c)      Employee's obligations under Sections 7, 8, 9 and 10 shall survive termination of Employee's employment with the Company and the expiration of this Agreement.

8.      **Duty to Protect Confidential and Proprietary Information.** Employee agrees that he will not at any time, in any fashion form or manner, either directly or indirectly, divulge, disclose or communicate to any person, firm or corporation in any manner whatsoever any information of any kind, nature or description concerning any matters affecting or relating to the business of the Company, including without limiting the generality of the foregoing, any of its customers, the prices it obtains or has obtained or at which it sells or has sold its services and/or products, or any other information of, about or concerning the business of the Company, its manner of operation, its plans, processes or other data of any kind, nature or description without regard to whether any or all of the foregoing matters would be deemed confidential, material or important, the parties hereto stipulating that as between them, the same are important, material and confidential, and gravely affect the effective and successful conduct of the business of the Company, and its goodwill, and that any breach of the terms of this paragraph are a material breach hereof.  Employee's duty of confidentiality as provided herein shall survive the termination and expiration of this Agreement and/or Employee's employment with the Company.

9.      **Covenant Not to Compete.** Employee hereby agrees and covenants that during the term of his employment by the Company and for a period of twenty four (24) months thereafter, Employee will not be employed by, or serve as a consultant to or for any business or enterprise in Park City, Utah (other than the Company and/or its subsidiaries), engaged in the same or similar field of endeavor as that of the Company without the express written consent of the Company.

10.     **No Solicitation of other Employees.** During the term of Employee's employment with the Company and for a period of twenty four (24) months thereafter, Employee agrees not to influence or attempt to influence any shareholder, employee, salesman, contractor or agent of the Company to terminate his employment or work with the Company or to work for or on behalf of any competitor or potential competitor of the Company, including without limitation, Employee or any other entity controlled or organized or to be controlled or organized by Employee or in which Employee is or will become an officer, a director or agent.

11.     **Remedies.** Employee understands that the Company would not have any adequate remedy at law for the material breach or threatened breach by him of any one or more of the covenants set forth in this Agreement and agrees that in the event of any such material breach or threatened breach, the Company may in addition to the other remedies which may be available to it:

(a)      Declare forfeited any monies, accrued fringe benefits and/or bonuses (not including salary) due and payable to him, and/or

4

(b)   File a suit in equity to enjoin him from the breach or threatened breach of such covenants.

12.   **Miscellaneous.**

(a)   **Assignment: Successors and Assigns.**   Employee agrees that he will not assign, sell, transfer, delegate or otherwise dispose of, whether voluntarily or involuntarily, or by operation of law, any rights or obligations under this Agreement, nor shall Employee's right be subject to encumbrance or the claims of creditors.   Any purported assignment, transfer, or delegation shall be null, void and of no effect.   Nothing in this Agreement shall prevent the consolidation of the Company with, or its merger into, any other corporation, or the sale by the Company of all or substantially all of its properties or assets, or the assignment by the Company of the Agreement and the performance of its obligations hereunder to any successor in interest or affiliated company.   Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

(b)   **Entire Agreement.**   The terms of this Agreement are intended by the parties to be the final expression of their agreement with respect to the employment of Employee by the Company, and may not be contradicted by evidence of any prior or contemporaneous agreement.   The parties further intend that this Agreement shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial, administrative, or other legal proceeding involving this Agreement.

(c)   **Amendments: Waiver.**   This Agreement may not be modified, amended, or terminated, except by an instrument in writing, signed by Employee and by a duly authorized representative of the Company, other than Employee.   By an instrument in writing similarly executed, either party may waive compliance by the other party with any provision of this Agreement that such other party was or is obligated to comply with or perform, provided, however, that such waiver shall not operate as a waiver of, or estoppel with respect to, any other or subsequent failure.   No failure to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof, or the exercise of any other right, remedy, or power provided herein or by law or in equity.

(d)   **Severability: Enforcement.**   If any provision of this Agreement, or the application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable, or void, the remainder of this Agreement and such provisions, as applied to other persons, places and circumstances shall remain in full force and effect.

(e)   **Governing Law.**   The validity, interpretation, enforceability, and performance of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Utah.

5

(f)     Attorney's Fees.     If either party defaults in any of the covenants or agreements contained herein, the defaulting party shall pay all costs and expenses, including a reasonable attorney's fee, incurred by the other party in enforcing its rights arising under this Agreement.

[INTENTIONALLY LEFT BLANK; SIGNATURE PAGE TO FOLLOW]

6

# EXHIBIT B

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To:   **Ashley Bailey**
      **Po Box 980991**
      **Park City, UT 84098**

From:   **Phoenix District Office**
        **3300 North Central Ave**
        **Suite 690**
        **Phoenix, AZ 85012**

☐   On behalf of person(s) aggrieved whose identity is
    *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 35C-2019-00364 | **Patricia A. Miner,** Supervisory Investigator | (602) 640-5036 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐   Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐   Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒   The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐   Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):**  EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

_____
**Elizabeth Cadle,**
**District Director**

NOV 1 4 2019
*(Date Mailed)*

Enclosures(s)

cc:
**James Abraham**
Owner
**PARK CITY DENTAL SPA**
1526 Ute Blvd Ste 212
Park City,  84098

**Andrew Stavros, Esq.**
**STAVROS LAW**
8915 South 700 East, Ste. 202
Sandy,  84070




## AMENDED CHARGE OF DISCRIMINATION

Labor Commission of Utah Anti-Discrimination Division and EEOC

**RECEIVED**

UALD No: 89-0364
EEOC No: 35C-2019-00364

| NAME *( Indicate Mr., Ms., Mrs. )* | | HOME TELEPHONE *(Include Area Code)* |
|---|---|---|
| Ashley G. Bailey | AUG 27 2019 | (414) 477-5877 |

STREET ADDRESS      CITY, STATE AND ZIP CODE

**ANTIDISCRIMINATION AND LABOR COMMISSION**

Po Box 980991, Park City UT 84098

DATE OF BIRTH
Sep 24, 1980

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME

| NAME | *( If more than one list below )* |
|---|---|
| Park City Dental Spa | TELEPHONE *( Include Area Code )* (435) 615-8500 |

STREET ADDRESS
1526 Ute Blvd Ste 212, Park City UT 84098

COUNTY
Summit

NAME                      STREET ADDRESS

**CAUSE OF DISCRIMINATION BASED ON**

☐ RACE   ☐ COLOR   ☒ SEX   ☒ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY
☐ GENDER IDENTITY   ☐ SEXUAL ORIENTATION   ☐ RELIGIOUS LIBERTY PROTECTION   ☐ CONTINUING ACTION

DATE DISCRIMINATION TOOK PLACE
EARLIEST          LATEST
                  02/04/2019

**THE PARTICULARS ARE** *( If additional space is needed, attach extra sheet(s))*

I was hired on or about March 1, 2014, as a Dental Associate. I am a female with closely held religious beliefs. I have reason to believe because of this, I have been subjected to discrimination.

"Shortly after I was hired my employer learned that I was a member of the predominant religion here in Utah. The owner and his wife, an office manager, made derogatory and discriminatory comments about my beliefs and members of my faith which I felt were harassing. Early in my employment, the office manager stated that she believed I would not last long because the last hygienist that was of the same faith could not hack it. These types of comments against my religion were frequent ongoing and offensive and made with intent to harm, humiliate and belittle me and my religion. I complained several times and expressed my discomfort regarding this speech to the owner and his wife. I was discriminated against due to my gender as I was given fewer patients than that of my male colleague and I was only given one chair to see patients where my male colleagues were given two chairs to see patients. The front desk was notified to fill my male colleagues schedule and make it a priority. I continually requested to see additional patients and nothing was done. In retaliation for my complaints regarding the discriminatory practices I was terminated on February 4, 2019. The determining factor to be my gender and my religious beliefs."

I have been harassed and discriminated against based on my gender and religious beliefs. I also believe I have been unlawfully retaliated against and the acts of my employer are in violation of Title VII of the Civil Rights Act of 1964 and the Utah Antidiscrimination Act of 1965, both as amended.

I understand this charge will be filed with both the EEOC and the State or local Agency, if any, unless jurisdictional issues dictate otherwise. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures

NOTARY

State of Utah          )
County of Summit       )  ss.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF CHARGING PARTY

X _____

SUBSCRIBED AND SWORN/AFFIRMED TO ME ON THIS ___ DAY OF
August          2019, by   Ashley G Bailey
                                   *(Charging Party)*

_____   2-20-2020
Notary Public          My Commission Expires

ASHLEE J ROCKHILL
Notary Public - State of Utah
Comm. No. 686623
My Commission Expires on
Feb 20, 2020